UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| O.Z. MARTIN,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT FOX, et al.,<br><br>    Defendants. | No.  2: 19-cv-2075 TLN KJN P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Introduction

    Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion. (ECF No. 45.)  For the reasons stated herein, the undersigned recommends that defendants' summary judgment motion be granted in part and denied in part.

Legal Standards for Summary Judgment

    Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,

1

> depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587; Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on April 16, 2020 (ECF No. 25), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

Plaintiff's Claims

This action proceeds on plaintiff's original complaint as to defendants Petras, Haile, Saukhla, Ditomas, Horch and Lewis. Plaintiff alleges that he has been diagnosed with Hepatitis

C ("HCV") since 1991.  Plaintiff alleges that the California Department of Health Care Services HCV Treatment Policy provides that individuals suffering from Stage 2 or greater hepatic fibrosis and debilitating fatigue are candidates for HCV treatment.  Plaintiff alleges that he has been a candidate for HCV treatment since March 14, 2016, when he suffered from body itching, debilitating fatigue, abdominal pain in the liver area and a worsened hepatitis fibrosis score. Plaintiff alleges that in September 2016, his condition deteriorated and he also suffered from nausea, vomiting, diarrhea and joint pain.

Plaintiff alleges that from November 2015 to July 2017, he complained to defendants Haile, Saukhla and Petras about his hepatitis C symptoms.  Plaintiff alleges that these defendants falsified plaintiff's medical records to state that plaintiff suffered from no symptoms in order to deny his request for treatment.  Plaintiff alleges that these defendants informed him that the cost of the treatment was too expensive.  Plaintiff alleges that these defendants knew of, or should have known, of the Health Care Services HCV Treatment Policy.

Plaintiff alleges that on August 8, 2017, defendant Saukhla finally found that plaintiff was eligible for HCV treatment.  On September 15, 2017, plaintiff's treatment commenced.  At that time, defendant Petras indicated that plaintiff had body wide itching, nausea and vomiting. Defendant Petras told plaintiff that because of his advanced HCV liver disease, it was unlikely that HCV treatment would have any effect on his HCV symptoms.

Plaintiff alleges that on October 19, 2017, defendant Saukhla examined plaintiff. Following this examination, defendant Saukhla allegedly falsely recorded that plaintiff did not complain of ongoing nausea, vomiting, loose bowels, body itching, abdominal pain, drowsiness, joint pain, etc.  On December 26, 2017, defendant Haile examined plaintiff.  Plaintiff alleges that following this examination, defendant Haile falsely wrote that plaintiff did not complain of ongoing symptoms.

On March 22, 2018, defendant Haile informed plaintiff that his HCV virus was non-detectable.  Plaintiff told defendant Haile that he still suffered from ongoing nausea, vomiting, loose bowels, body wide itching, abdominal pain, fatigue, etc.  Defendant Haile then falsely reported that plaintiff did not complain of these symptoms.

Plaintiff alleges that defendants Haile, Saukhla and Petras violated the Eighth Amendment by delaying his HCV treatment. Plaintiff alleges that defendants Ditomas, Horsch and Lewis violated the Eighth Amendment by denying his administrative grievances in which he sought HCV treatment based on his deteriorating liver functions and worsening symptoms.

Legal Standard for Eighth Amendment Inadequate Medical Care Claim

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096. A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Deliberate indifference is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. Jett, 439 F.3d at 1096.

Defendants' Evidence

*HCV and California Department of Corrections and Rehabilitation ("CDCR") HCV Treatment Policy*

Until relatively recently, treatment for most forms of HCV was highly toxic and not very effective. (ECF No. 45-5 at 3.) Accordingly, until recently, nationally-recognized HCV treatment guidelines recommended that patients be treated on the severity of their liver disease. (Id.) Patients with more advanced inflammation and liver fibrosis (scarring) were prioritized for treatment. (Id.) Patients with less advanced fibrosis were monitored, with the understanding that many of them would never progress to more severe liver disease or require treatment. (Id.)

In October 2014, the Food and Drug Administration ("FDA") approved the use of the drug Harvoni, and it represented a groundbreaking approach to the treatment of HCV. (Id.)

5

1  National healthcare organizations, from private insurers to Medicaid, then had to devise the most
2  prudent methods with which to incorporate this new treatment into existing protocols.  (Id.)  Most
3  practitioners used a cautious measured approach to the new treatment by providing treatment for
4  patients with more advanced disease.  (Id.)  This approach permitted the medical community to
5  become more familiar with the new treatment's use, safety and efficacy profile.  (Id.)  Moreover,
6  this approach was appropriate for HCV because it is a disease that progresses very slowly, if at
7  all.  (Id.)  CDCR's approach to HCV treatment has been consistent with nationally accepted
8  standards of medical treatment for HCV patients. (Id.)

9  During the time period alleged in the complaint, inmates in CDCR custody received HCV
10 treatment in accordance with the California Correctional Health Care Services ("CCHCS")
11 Hepatitis C Care Guide ("Care Guide").  (Id.)  This policy was developed under the direction of
12 the federal Receiver appointed in Plata v. Newsom, No. 4:01-cv-1351 (N.D. Cal.).  (Id.)  The
13 policy is regularly updated under the Receiver's direction to incorporate current medical literature
14 and recommendations from nationally-recognized medical groups.  (Id.)  During the relevant time
15 periods, three Care Guides were in effect from May 2015 to October 2015, October 2015 to
16 January 2017, and January 2017 to December 2017.  (Id.)

17 Pursuant to the Care Guides in effect between May 2015 and December 2017, HCV
18 treatment required approval from the CCHCS HCV Oversight Committee ("Oversight
19 Committee").  (Id.)  No individual CDCR physician at a local prison may unilaterally prescribe or
20 provide HCV treatment to an inmate without approval from the Oversight Committee.  (Id. at 3-
21 4.)  This means that defendants Petras, Haile and Saukhla could not authorize treatment for
22 plaintiff without approval from the Oversight Committee.  (Id. at 4.)  Defendants Ditomas, Horch
23 and Lewis, who reviewed and issued administrative decisions on plaintiff's grievances requesting
24 treatment, also could not have unilaterally authorized treatment.  (Id.)

25 During the time period relevant to this lawsuit, pursuant to the operative Care Guides,
26 treatment eligibility was based on estimated disease severity because not every patient with
27 chronic HCV required treatment.  (Id.)  After HCV infection, approximately 20% of infected
28 persons will clear HCV from their body without treatment.  (Id.)  Of the remaining 80%, most

6

individuals will have no significant sequelae, meaning no medical conditions, caused by their HCV infection. (Id.)

HCV persists in the liver in about 80% of those infected. (Id.) But only a minority, approximately 20% of those who are chronically infected, will slowly progress to cirrhosis over a 20 to 30 year time frame. (Id.) However, there is no single test that can predict which patients will progress to severe liver disease. (Id.) During the time period alleged in plaintiff's complaint, CCHCS Care Guide deferred treatment for those with minimal liver disease or a low likelihood of significant liver disease. (Id.)

During the time period at issue, HCV status and treatment eligibility was reassessed at least annually. (Id.) Physicians considered various tests including platelets, INR, albumin, AST/ALT, and total bilirubin, every six to twelve months to assess a patient's condition and evaluate whether the condition had progressed. (Id.)

Pursuant to the operative Care Guides, the risk of serious liver disease could be assessed using an FIB4 index. (Id.) The FIB4 index is a calculation of lab values that predicts a patient's current cirrhosis levels. (Id.) An FIB4 index higher than 3.25 has a positive predictive value of 82% percent to confirm the existence of stage 3 or 4 fibrosis, while an index less than 1.45 has a negative predictive value of 94.7% to exclude severe fibrosis. (Id.) FIB4 indices between 1.45 and 3.25 are not considered to be an accurate predictor of fibrosis stage. (Id.) Accordingly, patients with indices between 1.45 and 3.25 who have not recently had a biopsy or an equivalent stating method such as FibroScan are generally referred for further testing to assess their liver fibrosis levels. (Id. at 4-5.)

FibroScan is a specialized ultrasound machine for the liver that measures fibrosis in kilopascals (kPa). (ECF No. 45-7 at 3.) The result in kPa is then categorized into a fibrosis score ranging from F0 to F4. (Id.) A score of F0 to F1 indicates little to no liver scarring, whereas a score of F4 indicates advanced liver scarring (cirrhosis). (Id.) Pursuant to the operative Care Guides, CDCR inmate-patients with higher FibroScan scores would be referred to treatment authorization from the Oversight Committee, and treatment would be deferred for those patients with lower Fibroscan scores. (ECF No. 45-5 at 5.)

At all relevant times, the Care Guide required an inmate-patient's FIB4 score to be reevaluated annually. (Id.) FibroScans were to be repeated every five years in HIV-negative patients. (Id.) Frequent reassessment of these scores is not medically indicated because HCV, by nature, progresses very slowly, if at all. (Id.)

In December 2017, CCHCS revised the Care Guide, under the direction of the Receiver, with the goal of offering treatment to all those who are chronically infected. (Id.) The Receiver continues to control CCHCS's systemic functions, including HCV treatment. (Id.)

*Plaintiff's Care*

In August 2015 plaintiff transferred to the California Medical Facility ("CMF"). (ECF No. 45-7 at 3.)

On September 11, 2015, defendant Haile saw plaintiff in the HCV Clinic for a chronic HCV inmate appointment. (Id.) During the intake appointment, defendant Haile calculated plaintiff's FIB4 index. (Id.) On September 11, 2015, plaintiff had an FIB4 index of 1.70. (Id.) Because plaintiff's FIB4 index fell between 1.45 and 3.25, plaintiff was referred for a FibroScan to further assess his fibrosis level. (Id.) In the record from this appointment, defendant Haile wrote that plaintiff was in no "apparent dist." (Id. at 8.)

Plaintiff's FibroScan was completed on October 9, 2015, and indicated a result of 6.9 kPa, which translates to a fibrosis score of F1-F2. (Id. at 3.) Defendant Haile saw plaintiff for an appointment on November 6, 2015, in the HCV clinic to review these results. (Id.) Under the operative Care Guide issued in October 2015, FibroScan scores of F1 or F2 in patients who are HIV negative (like plaintiff) did not warrant a treatment authorization referral to the Oversight Committee. (Id.) In the record from this appointment, defendant Haile wrote that plaintiff "had no complaints today" and that plaintiff was in no "apparent distress." (Id. at 11.)

Defendant Saukhla saw plaintiff in the HCV clinic on April 28, 2016. (Id. at 4.) Plaintiff's FIB4 index was calculated as 2.11 in March 2016, which is noted on the appointment record for April 28, 2016. (Id.) At that time, the Care Guide issued in October 2015 was still in effect. (Id.) Plaintiff's FibroScan score of F1-F2 from October 2015 was therefore still current under the operative Care Guide. (Id.) Plaintiff did not qualify for an HCV treatment

8

authorization referral under the Care Guide at that time. (Id.) Defendant Saukhla noted that plaintiff would be due for updated labs in March 2017 and would have another visit in twelve months pursuant to the Care Guide. (Id.) In the record from this appointment, defendant Saukhla wrote, "Doing ok." (Id. at 13.)

An updated Care Guide was issued in January 2017. (Id. at 4.) However, the ranges for treatment referrals based on FIB4 indices and FibroScan scores remained the same. (Id.) In addition, as with the previous Care Guide, a patient's FIB4 score was to be reevaluated annually, and FibroScans were to be repeated every five years in HIV-negative patients. (Id.)

Defendant Saukhla evaluated plaintiff again in the HCV Clinic on February 1, 2017. (Id.) Plaintiff's FibroScan score of F1-F2 from October 2015 remained current under the operative Care Guide. (Id.) Plaintiff's FIB4 index was calculated at 2.0 in September 2016, which is noted on the appointment record for February 1, 2017. (Id.) Plaintiff's FIB4 score was also therefore current under the operative Care Guide. (Id.) Based on these metrics, pursuant to the Care Guide, plaintiff did not qualify for treatment authorization referral to the Oversight Committee at that time. (Id.) In the record from this appointment, defendant Saukhla wrote, "has off +on nausea, etc." (Id. at 15.) Defendant Saukhla also wrote, "D/W pt at length about [illegible] for Hep C r/x as per CCHCS HW Care Guide." (Id.)

On June 8, 2017, defendant Petras ordered a Fibrosure blood test. (Id at 4.) Fibrosure is a biomarker test that uses the results of six blood serum tests to generate a score that is correlated with the degree of liver damage in people with a variety of liver diseases. (Id. at 5) It has the same prognostic value as a liver biopsy. (Id.) In the record from June 8, 2017, defendant Petras wrote that plaintiff reported feeling itchy and fatigued. (Id. at 17.)

Plaintiff saw defendant Petras on June 22, 2017. (Id. at 5.) Defendant Petras's notes indicate that plaintiff's fibrosis level was measured at F3 based on the alternative Fibrosure blood test. (Id.) A score of F3 was sufficiently high for defendant Petras to request authorization for treatment from the Oversight Committee under the Care Guide. (Id.) Defendant Petras ordered pre-treatment lab work. (Id.)

////

Defendant Haile saw plaintiff in the HCV Clinic on July 26, 2017. (Id.) Defendant Haile ordered additional pre-treatment lab work to be completed (HBV DNA) before submission of the treatment authorization referral to the HCV Oversight Committee and set up a follow-up appointment in two weeks. (Id.)

Defendant Saukhla saw plaintiff in the HCV Clinic on August 17, 2017. (Id.) At that time, plaintiff's pre-treatment labs were completed. (Id.) Defendant Saukhla completed the treatment authorization referral to the Oversight Committee. (Id.) The referral form reflects plaintiff's FIB4 index calculated on June 26, 2017; his FibroScan score dated October 9, 2015; and his Fibrosure result from June 2017. (Id.)

Plaintiff was approved for HCV treatment with the medication Harvoni. (Id.) Plaintiff began Harvoni treatment on September 14, 2017. (Id.)

Defendant Saukhla saw plaintiff in the HCV Clinic on October 19, 2017, for a follow-up appointment regarding his treatment progress. (Id.) After four weeks of treatment with Harvoni, plaintiff's HCV viral load (the amount of virus in the blood) was undetectable, signifying a positive response to treatment with Harvoni. (Id. at 5-6.)

Defendant Haile saw plaintiff on December 26, 2017, for an appointment regarding his treatment results. (Id. at 6.) At that time, plaintiff had completed twelve weeks of treatment with Harvoni. (Id.) Following completion of the treatment, plaintiff's HCV viral load remained undetectable, indicating that treatment was successful. (Id.)

Defendant Haile saw plaintiff on March 22, 2018, for a follow-up appointment regarding his treatment. (Id.) The lab work completed on March 8, 2018, showed an undetectable HCV viral load, which confirmed that plaintiff had sustained a viral response and a desirable treatment response with Harvoni. (Id.) Plaintiff was discharged from the HCV Clinic, and he was to have follow-up appointments with his primary care provider. (Id.)

Since that time, plaintiff has had regular medical visits with defendant Petras and various other physicians for several health concerns, including prostate cancer. (Id.)

Plaintiff's medical records reflect that defendant Petras ordered a FibroScan for plaintiff in June 2020. (Id.) Plaintiff's fibrosis score was F0-F1, which indicates little or no liver scarring.

(Id.)

*Plaintiff's Administrative Grievance*

Plaintiff pursued grievance no. CMF-HC-16043371, alleging he was not receiving adequate treatment for HCV, among other issues. (ECF No. 45-4 at 3.) In the first level grievance, signed by plaintiff on November 16, 2016, plaintiff wrote that he currently suffered from chronic/severe joint pain, body itching, abdominal pain near his liver, nausea, vomiting, fatigue, loose bowels and vision problems. (Id. at 11.) This grievance was received at the institutional level on November 18, 2016. (Id. at 3.) Defendant Ditomas partially granted this grievance at the institutional level on December 6, 2016. (Id. at 3, 15.) In responding to plaintiff's request for adequate HCV treatment, defendant Ditomas wrote that plaintiff was referred to the Hepatitis C Clinic and this appointment is pending. (Id. at 15.)

Plaintiff appealed this grievance to the second level of review on January 25, 2017. (Id. at 3.) The appeal was partially granted at the second level of review by defendant Horch on February 15, 2017. (Id. 3, 13-14.) In relevant part, defendant Horch responded,

> You were seen for an evaluation for your Hep C on February 1, 2017. It is noted in your progress note, that your PCP discussed at length, the criteria for Hep C treatment per California Correctional Health Care Services (CCHCS) Hepatitis C Care Guide. Based on these current guidelines, you do not qualify for treatment at this time. Only 10-20 percent of people with chronic HCV develop severe liver disease, and because of the toxicity of the treatment medications, the risk outweighs the benefits for your early stage HCV. There is a chance that your disease may not progress at all. That is why you will receive follow-ups to monitor your FIB4 score. This is a rapidly changing field and newer, less toxic therapies are being developed constantly. As the therapies improve, the care guidelines will change. You will continue to be followed up by your PCP and your labs will continue to be monitored.

(Id. at 13-14.)

Plaintiff appealed the grievance to the headquarters level on March 13, 2017. (Id.) Defendant Lewis denied this grievance on July 25, 2017. (Id. 3, 5-6.) Regarding HCV, defendant Lewis noted that plaintiff's HCV condition will continue to be monitored with further review and work-up pending consideration for HCV treatment. (Id. at 5.) Defendant Lewis also set forth the guidelines for HCV treatment contained in the Care Guide. (Id. at 6.)

Plaintiff's Opposition

In his opposition, plaintiff argues that in 2015, CDCR adopted the national standards for HCV treatment set by the Center for Disease Control ("CDC"), the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA"). (ECF No. 51 at 109.) In support of this argument, plaintiff cites Exhibit C attached to his opposition. (Id.) Exhibit C contains pages from the May 2015 Care Guide and the December 2017 Care Guide. (Id. at 29-32.) The 2015 Care Guide states, in relevant part, that HCV treatment eligibility is based on estimated disease severity. (Id. at 29.) The pages from the 2015 Care Guide attached to plaintiff's exhibit C do not discuss the CDC, AASLD or ISDA standards for HCV treatment. (Id. at 29-30.)

The December 2017 Care Guide attached to plaintiff's exhibit C identifies one of the "goals" as "use most appropriate HCV treatment regimen based on AASLD/IDSA guidelines." (Id. at 31.) Under the section, "Patient Selection," the December 2017 Care Guide states,

> AASLD/IDSA recommends treatment for all patients with chronic HCV infection, except those with life expectancies < 12 months that cannot be remedied by treating HCV, by liver transplantation or by other directed therapy.
>
> Unless there is a medical contraindication, all patients with chronic HCV are treatment candidates if they desire treatment and are willing to adhere to medication and monitoring plan.
>
> AASLD/IDSA notes that there are factors that impact the access to HCV medications and the ability to deliver HCV treatments to patients. Strategies for prioritizing HCV treatment based on AASLD/IDSA guidance are discussed on page 5.

(Id.)

The pages from the Care Guides attached to plaintiff's Exhibit C are consistent with defendants' evidence demonstrating that up until December 2017, HCV treatment for inmates in CDCR custody was determined based on disease severity.

Attached to plaintiff's Exhibit B are pages from a July 1, 2015 memorandum, issued by the California Department of Health Care Services (DHCS), titled "Treatment Policy for the Management of Chronic Hepatitis C." (Id. at 26-27.) This memorandum states that the policy discussed in this document was developed by DHCS based on a review of the medical literature,

the most recent guidelines and reports published by several organizations including the AASLD and the IDSA.  (Id. at 26.)  The memorandum goes on to state, in relevant part,

> Treatment considerations and choice of regimen for hepatitis C virus infected patients:
>
> Please refer to AASLD guidelines (hcvguidelines.org) for recommended treatment regimens and durations.
>
> Identifying treatment candidates:
>
> A. Disease Prognosis and Severity—Any of the following clinical states identify candidates for treatment:
>
> i. Evidence of stage 2 or greater hepatic fibrosis/cirrhosis including one of the following:  Liver biopsy confirming a METAVIR score F2 or greater; OR Transient elastography (Fibroscan) score greater than or equal to 7.5 kPa; OR FibroSure score of greater than or equal to 0.48; OR APRI score greater than 0.7 OR FEB-4 greater than 3.25.

(Id.)

The DHCS memorandum did not apply to plaintiff during the relevant time period.  Therefore, the relevance of the DHCS memorandum is unclear because defendants were required to follow the standards set forth in the Care Guide in providing HCV treatment.  Plaintiff also does not raise a claim challenging the constitutionality of the standards in the Care Guide.  In any event, the undersigned observes that plaintiff does not dispute that his October 9, 2015 FibroScan Score was 6.9 kPa.  Based on this score alone, under the DHCS policy set forth above, it does not appear that plaintiff would have been entitled to treatment.

Plaintiff's main argument in his verified complaint and verified opposition is that defendants disregarded his symptoms in order to deny him treatment.  The undersigned discusses plaintiff's evidence submitted in support of this argument.

Plaintiff alleges that on November 6, 2015, he told defendant Haile that he had itchy skin and abdominal pain in the liver area.  (ECF No. 51 at 5.)  In the record from that date, defendant Haile wrote that plaintiff had "no complaints today."  (Id. at 43.)

Plaintiff alleges that on April 5, 2016, he told defendant Petras that he had ongoing body itching, abdominal pain in the liver area and fatigue.  (Id. at 5.)  Plaintiff alleges that defendant Petras falsely recorded that plaintiff had no complaints.  The medical record from April 5, 2016,

indicates that defendant Petras examined plaintiff based on complaints regarding sinus symptoms. (Id. at 49.) It does not appear that plaintiff's HCV was discussed at this examination. (Id.)

Plaintiff alleges that April 28, 2016, he told defendant Saukhla that he suffered from itching skin, abdominal pain in the liver area and fatigue. (Id. at 5.) Plaintiff alleges that defendant Saukhla falsely recorded that plaintiff had no complaints. (Id. at 6.) The medical records from that day state that plaintiff was there for a follow-up regarding HCV labs and that he was doing okay and had no pain. (Id. at 52.)

Plaintiff alleges that around September 11, 2016, his symptoms went "severe," with nausea, vomiting, diarrhea, body itching, fatigue and joint pain. (Id. at 6.)

Plaintiff alleges that on September 19, 2016, plaintiff told defendant Petras that he had nausea, vomiting, diarrhea, body itching, abdominal pain fatigue and joint pain. (Id. at 6-7.) Plaintiff alleges that defendant Petras failed to report in the records from that date that plaintiff had diarrhea, abdominal pain, fatigue and joint pain. (Id. at 7.) In the September 19, 2016 medical record, defendant Petras wrote that plaintiff had new symptoms of nausea and vomiting and complained of pain. (Id. at 64.)

Plaintiff also provides a medical record from October 19, 2016 in which defendant Petras wrote that plaintiff had itching all over, and joint pain. (Id. at 65.) It appears that defendant Petras also wrote that plaintiff "looks fatigued" (Id.)

Plaintiff also provides a medical record from December 2, 2016, in which defendant Petras wrote that plaintiff complained of symptoms that had been bothering him for 4-6 months including daily nausea and occasional vomiting, itchiness all over his body and body pain. (Id. at 66.)

Plaintiff alleges in the verified opposition that on December 30, 2016, he was seen in the prison clinic on an emergency basis for acute nausea, vomiting and diarrhea. (Id. at 8.)

Plaintiff alleges that on February 1, 2017, he told defendant Saukhla about his ongoing nausea, vomiting, fatigue, diarrhea, abdominal pain, body itching and fatigue. (Id. at 8.) Plaintiff argues that the records from that date do not state that plaintiff suffered any of the symptoms he complained of. (Id.) The record from that date indicates that defendant Saukhla recorded that

plaintiff had "off and on … pain, nausea, etc." (Id. at 67.) Defendant Saukhla wrote that he discussed with plaintiff "about … for hep C r/x as per CCCHCS HW care guide." (Id.)

Plaintiff allege that on February 24, 2017, and March 24, 2017, he complained to defendant Petras about ongoing nausea, vomiting, abdominal pain in the liver area, body itching, loose bowels, fatigue and joint pain. (Id. at 8.) Plaintiff alleges that defendant Petras falsely recorded that plaintiff did not have these symptoms. (Id.)

In the record from February 24, 2017, defendant Petras wrote that plaintiff had vomiting and nausea. (Id. at 68.) Defendant Petras noted that plaintiff did not qualify for HCV treatment per the CDCR guidelines. (Id.) The record from March 24, 2017, indicates that defendant Petras did not address plaintiff's HCV during this appointment. (Id. at 70.)

Although not discussed in the opposition, plaintiff attaches a record from March 13, 2017, wherein defendant Petras wrote that plaintiff complained of itchiness. (Id. at 69.) Defendant Petras wrote that plaintiff was not eligible for HCV treatment per CDCR guidelines. (Id.)

Attached to plaintiff's opposition as an exhibit are pages from the Merck Manual Home Health Handbook addressing hepatitis C. (Id. at 34-36.) The Merck Manual Home Health Handbook describes signs and symptoms of Hepatitis C as fatigue, loss of appetite, nausea, vomiting, abdominal pain, dark yellow urine, yellowish skin and eyes, itching of the skin, clay-colored bowel movements and joint pain. (Id. at 36.)

Discussion

*Motion for Summary Judgment on the Grounds that Plaintiff Does Not Meet Objective Component of Deliberate Indifference*

Defendants argue that plaintiff does not meet the objective component of deliberate indifference because he did not suffer a sufficiently serious medical condition that necessitated treatment before receiving his Fibrosure results in June 2017.

The objective prong of the deliberate indifference standard requires that an alleged deprivation be sufficiently serious. Hudson v. McMillian, 503 U.S. 1, 8–9 (1992). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are

15

'serious.'" Id. at 9. "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that prison has a 'serious' need for medical treatment." McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992), overruled on other grounds by, WMX Tech, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

As discussed above, defendants' evidence indicates that in December 2017, CCHCS revised the Care Guide, under the direction of the Receiver, with the goal of offering treatment to all inmates who are chronically infected with HCV, apparently regardless of severity of disease. Therefore, plaintiff would have qualified for treatment in December 2017 even with a FibroScan score of F1-F2. In addition, as discussed herein, plaintiff presented evidence suggesting that he may have qualified for treatment prior to June 2017 after he became symptomatic for HCV. For these reasons, the undersigned does not find that defendants have shown that plaintiff did not have a serious medical need. Defendants are not entitled to summary judgment on these grounds. See Andrews v. Cervantes, 493 F.3d, 1047, 1055 & n. 8 (9th Cir. 2007) (hepatitis C is a chronic disease that "quite obviously cause[s] serious health problems, and can result in death.")

*Motion for Summary Judgment on the Grounds that Plaintiff Does Not Meet Subjective Component of Deliberate Indifference*

Defendants argue that plaintiff does not demonstrate the subjective component of deliberate indifference because the undisputed evidence shows that they denied plaintiff's requests for treatment because he did not qualify for treatment until June 2017 based on the policy established by the Receiver. Defendants also argue that plaintiff's argument that he was entitled to treatment prior to June 2017 demonstrates, at most, a difference of opinion which does not amount to deliberate indifference.

The undersigned finds that the undisputed evidence demonstrates that, pursuant to the standard in the Care Guide during the relevant time period, inmates with HCV at less than F3 did not qualify for treatment. It is also undisputed that plaintiff did not have an F3 test result until June 2017. Once plaintiff had that result, plaintiff received treatment.

The undersigned further finds that while plaintiff claims that defendants failed to record his HCV symptoms beginning in November 2015, the medical records indicate that plaintiff did not complain of any symptoms possibly related to HCV until September 19, 2016. On September 19, 2016, plaintiff complained of nausea, vomiting and pain. The records demonstrate that after September 2016, plaintiff consistently complained of these symptoms and other symptoms possibly related to HCV.

While it is undisputed that plaintiff did not have an F3 score qualifying him for treatment until June 2017, defendants do not address plaintiff's claim that they disregarded his symptoms once he became symptomatic. Defendants do not argue, for example, that plaintiff's symptoms were not indicative of progression of the disease. Defendants do not address why they waited nine months after September 2016 to order further testing, including what prompted defendant Petras to order the Fibrosure test in June 2017. While the October 9, 2015 FibroScan was valid for five years, defendants apparently had some discretion to order further testing, as demonstrated by defendant Petras's order of the Fibrosure test in June 2017.

Without further explanation of the records showing that defendants waited nine months after plaintiff became symptomatic to provide plaintiff with further testing, the undersigned cannot determine whether defendants acted with deliberate indifference.[1] By waiting nine months after plaintiff became symptomatic to provide further testing, defendants may have effectively delayed plaintiff's receipt of treatment. Defendants do not move for summary judgment on the grounds that a delay in plaintiff's receipt of treatment did not cause harm. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002) (where a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay caused "significant harm and that defendants should have known this to be the case.").

---

[1] The undersigned acknowledges that in his declaration submitted in support of the summary judgment motion, defendant Saukhla states, "[a] Fibrosure test was above and beyond the standards of the requirements set forth in the Care Guide in 2017." (ECF No. 45-7 at 5.) In his declaration, defendant Saukhla does not address the medical records indicating plaintiff's symptoms beginning in September 2016 which apparently became progressively worse. Therefore, defendant Saukhla did not consider all of the relevant medical records in forming his opinion that the Fibrosure test was above and beyond the Care Guide standards.

Defendants argue that defendants Ditomas, Horch and Lewis applied the standards contained in the Care Guides when addressing plaintiff's grievances. In his grievance, plaintiff requested treatment and stated that he suffered from symptoms including joint pain, body itching, abdominal pain, nausea, vomiting and fatigue. As discussed above, defendant Ditomas did not grant plaintiff's request for treatment in the December 6, 2016 memorandum addressing plaintiff's grievance. Without further explanation regarding whether defendant Ditomas reviewed plaintiff's medical records, which showed that plaintiff had new symptoms possibly related to HCV, the undersigned cannot determine whether defendant Ditomas acted with deliberate indifference when she failed to order further testing and denied plaintiff's request for treatment.

Defendant Horch denied plaintiff's grievance requesting HCV treatment on February 17, 2017. Without further explanation regarding whether defendant Horch reviewed plaintiff's medical records, which showed that plaintiff had new symptoms possibly related to HCV, the undersigned cannot determine whether defendant Horch acted with deliberate indifference when he failed to order further testing and denied plaintiff's request for treatment.

Defendant Lewis denied plaintiff's grievance requesting treatment on July 25, 2017. By that time, defendant Petras had received the results of plaintiff's Fibrosure test and ordered pre-treatment lab work for plaintiff. In his response to plaintiff's grievance, defendant Lewis acknowledges that plaintiff had been referred for work-up pending consideration for HCV treatment. (ECF No. 45-4 at 5.) Therefore, defendant Lewis's response to plaintiff's grievance had no impact on plaintiff's receipt of treatment. Because defendant Lewis's response to plaintiff's grievance did not cause plaintiff harm, defendant Lewis should be granted summary judgment. Jett, 439 F.3d at 1096 (deliberate indifference is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm.)

For the reasons discussed above, the undersigned recommends that defendants' motion for summary judgment on the grounds that plaintiff does not meet the subjective component of

////

////

deliberate indifference, except for defendant Lewis, be denied.[2]

*Qualified Immunity*

Defendants move for summary judgment based on qualified immunity. Qualified immunity protects § 1983 defendants from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. Saucier v. Katz, 533 U.S. 194, 231 (2001), abrogated in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier, 533 U.S. at 201, the Supreme Court set forth a two-prong test to be applied in evaluating claims of qualified immunity: (1) whether the facts alleged, when taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right; and (2) whether the right was clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his/her conduct was unlawful in the situation he confronted." Id. at 202. The district court may analyze either prong of qualified immunity first. Id. at 236.

Defendants argue that they are entitled to qualified immunity because reasonable officials in their positions could have believed that treating inmate-patients in accordance with the Care Guide, put in place at the direction of the Receiver in the Plata litigation, would be lawful.

////

---

[2] The undersigned acknowledges that plaintiff's claim that defendants failed to record his HCV symptoms beginning in November 2015 is somewhat inconsistent with the evidence of plaintiff's October 2015 FibroScan indicating a fibrosis score of F1-F2. In other words, plaintiff's symptoms were not necessarily indicative of worsening HCV as they allegedly first occurred close in time to the October 2015 FibroScan test. However, plaintiff also alleges that his condition became worse in September 2016. For this reason, based on the current record, the undersigned does not find that plaintiff's claim that he began complaining about his symptoms in November 2015 necessarily undermines his Eighth Amendment claims.

As discussed above, the record contains evidence demonstrating that plaintiff began complaining about symptoms possibly related to HCV in September 2016, which became progressively worse. Without further factual development regarding why defendants waited approximately nine months to order further testing of plaintiff's fibrosis level, the undersigned cannot determine whether defendants are entitled to qualified immunity. Accordingly, defendants' motion for summary judgment based on qualified immunity should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 45) be granted as to defendant Lewis and denied in all other respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 6, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Mart2075.sj(3)